UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

THE TRAVELERS INDEMNITY
COMPANY OF CONNECTICUT,

     Plaintiff,

v.                                  CASE NO. 8:17-cv-2106-T-23CPT

RICHARD MCKENZIE & SONS, INC.,
and HERMANNS REAL ESTATE
VENTURES, LLC,

     Defendants.

_____/

## <u>ORDER</u>

Citrus-grove owner Richard Hermanns attempts to squeeze $2.965 million from Travelers Indemnity Company based on Hermanns's consent judgment against Richard McKenzie, the former manager of Hermanns's grove and a former insured under a Travelers Commercial General Liability (CGL) policy with a "farm care-taker liability" endorsement. The consent judgment results from an episode in which McKenzie — according to Hermanns's allegations in earlier civil and criminal actions — allegedly misappropriated fuel, trees, and fertilizer from the grove and breached the parties' contract. Hermanns's effort to concentrate on the endorsement yields no fruit: The insurance policy excludes coverage, the consent judgment is unreasonable, and the insurer owed no duty to defend.

# BACKGROUND

Convinced that citrus growing would yield a large profit, Richard Hermanns bought 265 acres of citrus groves in Polk County in 2010 and 2011. Before the first purchase, Hermanns (through his partnership, Hermanns Real Estate Ventures) requested an appraisal from Brent Burris, a knowledgeable appraiser of agricultural real estate. Burris questioned the suitability of the tract for growing and observed that the land was prone to cold and standing water and that the sandy soils were not conducive to growing citrus. (Doc. 107-3 at 19–30) Despite Burris's appraisal, Hermanns bought a 100-acre grove in 2010, and the next year Hermanns bought a 165-acre grove contiguous to the first grove. Soon after buying the first grove, Hermanns hired Richard McKenzie's company, Richard McKenzie & Sons, to "maximize the grove's profit" and in effect provided McKenzie *carte blanche* in the operation of the grove. (Hermanns Depo. at 35–36) Rather than charge a management fee per acre, McKenzie billed Hermanns for supplies purchased and labor expended, but — with Hermanns' understanding and tacit approval — McKenzie "mark[ed] up" the bills. (Hermanns Depo. at 35–36) For example, McKenzie might charge Hermanns ten dollars for a pound of fertilizer purchased for eight dollars.

McKenzie hired Matthew Carter, another grove caretaker, to re-plant a fraction of the grove, which the parties call the "Sinkhole Road grove," and to spray pesticide on the trees. From January 2013 until July or August 2013, Carter worked on the grove, but late that summer McKenzie stopped paying Carter, who inquired

directly with Hermanns about the money owed to Carter for working on Hermanns's grove. (Carter Depo. at 25, 37, 64–66)

Carter's inquiry prompted Hermanns to scrutinize McKenzie's bills. After reviewing the bills and consulting with Carter (who identified several instances in which McKenzie charged Hermanns for "Carter services" never provided by Carter) Hermanns pressed the State Attorney for Polk County to charge McKenzie with theft. Finding probable cause to suspect that McKenzie deliberately billed Hermanns for $113,000 in trees never delivered to the Sinkhole Road grove, billed Hermanns for fuel that McKenzie used for his own purposes, and billed Hermanns for fertilizer and other products not applied to Hermanns's crop, the State Attorney charged McKenzie with a scheme to defraud and with grand theft exceeding $100,000. These criminal charges remain pending in state court.

Before the criminal action, Hermanns asked Kyle Story, another grove care-taker, to assess the condition of the grove. Several sights struck Story. First, the groves appeared "thinly" planted. In 2010 and 2011, most growers planted about 150 trees per acre, but Story counted just 115 trees per acre. Second, many trees appeared injured by water saturation. Story later concluded that inadequate drainage and improper maintenance of the irrigation system left stagnant water in the grove for days or weeks. Third, most of the trees appeared infected by "huanglongbing," more commonly known as greening, a disease that impedes a root's absorption of nutrients. The incurable disease reduces a tree's yield, and the remaining fruit is misshapen, unsightly, and unsuitable for sale except to an

orange-juice producer. (Story Depo. at 18–19) Eventually, greening kills the tree. Story and Carter initially thought that greening affected at least 80% of the grove, an infection rate similar to most groves in Florida. Hermanns concluded that greening affected most if not all of his trees. (Hermanns Depo. at 101) Late in 2013, Hermanns fired McKenzie and hired Story to manage the grove.

In February 2015, Hermanns sued McKenzie in the Circuit Court for Polk County. Hermanns alleged breach of an oral contract (count one) and breach of fiduciary duty (count three) and demanded an equitable accounting (count two) for the money paid to McKenzie under the contract. In the breach-of-contract claim, Hermanns alleged that his damages included the money paid to McKenzie and the profit lost because of McKenzie's mismanagement. In the accounting claim, Hermanns alleged that McKenzie acted "with the intent to permanently deprive" Hermanns of "its monies and profits[,] otherwise appropriating same as its own or for its own uses." Through discovery, Hermanns learned that from 2009 to 2013 Travelers Indemnity Company insured McKenzie's company under a CGL with an endorsement for "farm care-taker liability." Although the CGL obligated McKenzie to notify Travelers "as soon as practicable of an 'occurrence' or an offense" that might result in a claim (Doc. 105-10 at 55), the record contains no evidence that McKenzie promptly notified Travelers about an "occurrence" or about Hermanns's claims. McKenzie believes that he notified Travelers about the state-court civil action at some unspecified "later time." (McKenzie Depo. at 75)

In February 2016, less than two weeks after the State Attorney charged McKenzie with grand theft and a scheme to defraud, Hermanns amended the civil complaint to add a negligence claim (count four).  Hermanns cannot explain the purpose of the amendment and cannot recall "any new facts or evidence" that warranted the amendment.  (Hermanns Depo. at 70)  As in the breach-of-contract claim, Hermanns sought in the negligence claim profit lost because of McKenzie's conduct.  After the amended complaint, Hermanns provided McKenzie with an "expert" opinion letter (Doc. 107-21) signed by Story, the manager whom Hermanns hired to replace McKenzie.  Without receiving compensation other than that paid for managing the grove (Story Depo. at 56), Story opined in the letter that Hermanns lost at least $464,625 in "net income" in 2016 from McKenzie's purportedly "negligent" care and maintenance.  Story wrote that these damages "will continue for the next 20 years because of the thin planting" and concluded that Hermanns incurred "damages in excess of $2,965,750."  Despite claiming that damages would continue for twenty years, Story never calculated the damages beyond 2021 because Story felt that "reaching out beyond that period of time was irresponsible."  (Story Depo. at 104) Erin Moore, Travelers' corporate representative, testified that Travelers learned about the state-court action when Hermanns's counsel demanded coverage for McKenzie based on the amended complaint.  (Moore Depo. at 26)

McKenzie's attorney in the state-court civil action, Ken Waterway, never retained a rebuttal expert to analyze and refute Story's damages calculation. Waterway's "investigation" of the claimed damages consisted only of providing the

Story letter to McKenzie and asking for McKenzie's thoughts on the letter. Sometime in the fall of 2016, Hermanns and McKenzie agreed to settle the civil action. Under the settlement, McKenzie agreed to pay $200,000 to resolve the claims for breach of contract, for an equitable accounting, and for breach of fiduciary duty. On count four, the negligence claim, McKenzie agreed to a consent judgment against him for $2,965,750, but Hermanns agreed not to execute against McKenzie. Instead, McKenzie assigned to Hermanns all of McKenzie's rights under the Travelers CGL, including the right to sue for breach of contract and, if Hermanns successfully establishes coverage in this action, for bad faith. Finally, Hermanns agreed to recommend to the State Attorney the resolution "most favorable" to McKenzie in the criminal action. (Doc. 107-19 at 6) Hermanns understood the provision as obligating Hermanns — assuming McKenzie pays the $200,000 — to discourage the State Attorney's pursuing jail time, and McKenzie contemplated a pretrial diversion in which he would serve no jail time.

In this coverage action (the second in the *Coblentz* tryptych), Travelers sues (Doc. 9) for a declaration exonerating Travelers from liability to Hermanns under the CGL. As the assignee of McKenzie's rights under the CGL, Hermanns counterclaims (Doc. 39) for breach of the insurance policy and for a declaration that Travelers owes a duty to indemnify McKenzie for the $2.965 million consent judgment. Moving for summary judgment, Travelers argues (Doc. 108) that the policy excludes expected or intended damage, that the settlement is unreasonable and resulted from collusion between Hermanns and McKenzie, that Travelers owed

no duty to defend McKenzie against Hermanns's claims in the state-court civil action, and that the parties improperly attribute to the negligence claim damages from the breach-of-contract and the breach-of-fiduciary-duty claims. Hermanns moves (Doc. 106) for partial summary judgment on Travelers' duty to defend McKenzie in the state-court civil action.

## DISCUSSION

To recover from Travelers under the *Coblentz* agreement, Hermanns must show that the CGL covers the settlement, that Travelers wrongfully refused to defend McKenzie in the state-court civil action, that the settlement is reasonable, and that McKenzie and Hermanns settled "in good faith" and without colluding. *Mid-Continent Cas. Co. v. Royal Crane, LLC*, 169 So. 3d 174 (Fla. 4th DCA 2015). To the extent Travelers requests exoneration based on an exclusion, Travelers must show the applicability of the exclusion. *LaFarge Corp. v. Travelers Indem. Co.*, 118 F.3d 1511, 1516 (11th Cir. 1997).

### I. Coverage

Among other items, the policy covers "property damage" caused by an "occurrence," which means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Doc. 105-10 at 46 and 59) Under the policy, "property damage"[1] means:

---

[1] The parties dispute whether the cost of repairing, replacing, or removing a contractor's deficient work constitutes "property damage" under Florida law. Arguing that none of the of replacement or repair cost constitutes "property damage," Travelers relies primarily on a line of Florida decisions dating to *LaMarche v. Shelby Mut. Ins. Co.*, 390 So.2d 325 (Fla. 1980), which states

(continued...)

a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

(Doc. 105-10 at 60)  But the policy excludes coverage for "property damage" to:

j(6) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations.

(Doc. 105-10 at 49)

**A. The policy excludes "expected or intended" damage.**

In arguing for coverage under the CGL, Hermanns finds himself in an intractable bind.  The CGL excludes property damage "expected or intended" from McKenzie's "standpoint,"[2] and Hermanns alleges (and the State Attorney, after weighing Hermanns's testimony and the evidence marshaled by Hermanns, alleges in the criminal action) that McKenzie intentionally pilfered or otherwise purloined

_____

(...continued)
in dicta that a CGL excludes coverage for the "replacement and repair of" the defective product. But *LaMarche* holds only that an exclusion cannot expand coverage and that the exclusion in that action contained no ambiguity. *U.S. Fire Ins. Co. v. J.S.U.B., Inc.*, 979 So. 2d 871, 880–81 (Fla. 2007) (describing the holding of *LaMarche*). Several decisions cite *LaMarche*'s dicta as a holding and find "as a matter of public policy" that a CGL excludes the cost of repairing or replacing an insured's defective work. *See, e.g.*, *Aetna Cas. and Sur. Co. of Am. v. Deluxe Sys., Inc., of Fla.*, 711 So. 2d 1293, 1296 (Fla. 4th DCA 1998); *see also Pozzi Window Co. v. Auto-Owners Ins.*, 446 F.3d 1178, 1185–86 (11th Cir. 2006) (collecting authority that "applie[s] *LaMarche* broadly"). But in most (or perhaps all) of the decisions, a "Your Work" exclusion in provision j(6) excludes "property damage" to "any property that must be restored, repaired, or replaced because 'your work' was performed incorrectly." In this action, Travelers and McKenzie agreed to remove the 'Your Work' exclusion, an atypical bargain that appears to distinguish this policy from the typical CGL policy and appears to distinguish this action from the weight of authority.

[2] Exclusion A provides: "This insurance does not apply to . . . '[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured." (Doc. 105-10 at 47)

materials that belonged to Hermanns.  (Doc. 107-12 at 5–9)  For example, a memorandum from Hermanns to McKenzie in the state-court civil action claims a "minimum" of $451,804.77 in damage from misappropriated fuel, undelivered trees, and fictitious fertilizer applications.  (Doc. 107-18)

Travelers correctly observes the impracticability of distinguishing between damage that resulted from the purported "negligence" and damage that resulted from McKenzie's "intentional" misconduct.  For example, Story attributes the grove's "thin" planting to negligence, but Hermanns's allegations in the other action and his communications with the State Attorney establish that the Sinkhole Road grove lacked the industry-standard 150 trees per acre partly because (to quote Hermanns) McKenzie "intentionally" diverted to his own use trees that belonged to Hermanns.  Because the damage from McKenzie's calculated theft and the damage from McKenzie's so-called negligence appear indistinguishable, Hermanns cannot recover under the CGL.  *See Bradfield v. Mid-Continent Cas.* Co., 143 F.Supp.3d 1215, 1245–48 (M.D. Fla. 2015) (Hodges, J.) (holding that the failure to apportion between covered and uncovered damages precludes recovery under a CGL); *Highland Holdings, Inc. v. Mid-Continent Cas. Co.*, 2016 WL 3447523 (M.D. Fla. June 23, 2016) (same), *aff'd*, 687 Fed.Appx. 819 (11th Cir. May 2, 2017).

### B. The CGL excludes damage to "[t]hat particular part of real property on which you . . . are performing operations."

Provision j(5) excludes property damage to "[t]hat particular part of real property on which you . . . are performing operations."  Similar to the exclusions in

*Weedo*, this "business risk" exclusion excludes coverage for property damage

that "aris[es] from ongoing work." *Oak Ford Owners Ass'n v. Auto-Owners Ins. Co.*,

510 F.Supp.2d 812, 819 (M.D. Fla. 2007) (Whittemore, J.). Throughout this action,

Hermanns admitted that McKenzie managed the entire 265-acre grove and that

the grove incurred damage during McKenzie's tenure. The amended state-court

complaint alleges that Hermanns suffered damage from McKenzie's "negligently

performing [] services" on the grove. (Doc. 107-12 at 9) Because Hermanns claims

damage to the "particular part" of the "real property"[3] on which McKenzie was

"performing operations," provision j(5) excludes coverage.

Citing *Essex Ins. Co. v. Kart Const., Inc.*, 2015 WL 4730540 (M.D. Fla. Aug. 10,

2015), Hermanns argues that interpreting "that particular part" to mean the 265-acre

grove "falls well short of the granular dissection" required by the exclusion. In

*Essex*, which involves facts decisively different from this action, a company hired a

contractor to weld a 10-foot section of a 127-foot cellular tower. In preparation for

the welding, the contractor removed debris from the entire tower, doused the entire

tower with water, and posted nearby a monitor who watched the tower during the

welding. Despite the contractor's care, a fire destroyed the tower. The insurer

denied coverage based partly on the j(5) exclusion and contended that the contractor,

---

[3] The trees planted at the grove and the citrus crop constitute "real property," a point not disputed by Hermanns. *See Black's Law Dictionary*, 8th ed. 2004 at 1293 (defining "realty" or "real property" as "[l]and and anything growing on, attached to, or erected on it, that cannot be removed without injury to the land"); *see also Peer v. Willson*, 210 So. 2d 495 (Fla. 2d DCA 1968) (holding that a crop constitutes "real property").

by posting a monitor whose vantage included the entire tower, was "performing operations" on the entire tower. Rejecting that argument, *Essex* states:

> [M]onitoring is difficult to describe as an operation performed "on" anything and is even more difficult to describe as an operation performed "on" everything in view.

2015 WL 4730540 at *6. *Essex* holds that provision j(5) excludes damage to the 10-foot section because "at the time of the accident [the contractor's] (relevant) operations occurred only on a ten-foot portion of the tower." Unlike in the insurer's (unsuccessful) argument in *Essex*, McKenzie's "operations" consisted of more than watching or monitoring the grove. McKenzie cleared debris, planted trees, installed and repaired the irrigation system, sprayed pesticides, and applied (or sometimes misapplied) fertilizer to the entire grove. (Hermanns Depo. at 33, 36, 57; McKenzie Depo. at 32–36 and 52) These purportedly deficient operations allegedly damaged Hermanns. In this instance, "that particular part" of the real property on which McKenzie operated spans 265 acres, and the j(5) provision excludes all of the damage to the entire grove.[4] *See Bradfield v. Mid-Continent Cas. Co.*, 143 F.Supp.3d 1215, 1243–45 (M.D. Fla. 2015) (Hodges, J.) (holding that the j(5) provision excluded coverage for "all of the property damage").

---

[4] Although dicta in *Liberty Mut. Fire Ins. Co. v. Mark Yacht Club on Brickell Bay, Inc.*, 2009 WL 26330064 (S.D. Fla. Aug. 25, 2009), suggests the inapplicability of the j(5) exclusion to a management contract, the decision holds only that vague allegations in the underlying complaint "potentially" triggered the duty to defend. In any event, Hermanns identifies in the CGL no "management-contract" exception to the j(5) exclusion. As Travelers correctly argues (Doc. 133 at 4), the judiciary cannot revise the contract to remove the j(5) exclusion.

## II. Reasonableness of the consent judgment

A settlement is unreasonable if the settlement exceeds the amount for which a reasonably prudent defendant would settle after weighing the uncertainty of litigation and the plaintiff's prospective recovery at trial. *Indep. Fire Ins. Co. v. Paulekas*, 633 So. 2d 1111 (Fla. 3d DCA 1994). In an attempt to show the reasonableness of the $2.965 million consent judgment, Hermanns submits affidavits from the counsel who crafted the settlement agreement (Docs. 125-4 and 125-5), but the record reveals a settlement that inadequately accounts for Story's confusing and erroneous damages calculation, inadequately accounts for the reduction in crop yield attributable to greening, and inadequately accounts for the fact that Hermanns's damages resulted either from McKenzie's alleged theft or McKenzie's alleged breach of contract, not from "negligence." Considered separately or collectively, these defects render the settlement unreasonable. Even viewing the record favorably to Hermanns, no reasonable jury could conclude that a reasonably prudent defendant facing personal liability would agree to a judgment in the ballpark of $2.965 million. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (explaining that Rule 56, Federal Rules of Civil Procedure, precludes summary judgment if a dispute of material fact "is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

**A. "Lost revenue" impermissibly constitutes the majority of the $2.965 million consent judgment.**

If a plaintiff identifies damages calculable with reasonable certainty and likely caused by the defendant's misconduct, the plaintiff might recover lost "net" profit (that is, revenue minus expenses), not "lost revenue" or "lost income" or "lost gross profit" or any other figure. *Del Monte Fresh Produce Co. v. Net Results, Inc.*, 77 So. 3d 667 (Fla. 3d DCA 2011); *Born v. Goldstein*, 450 So. 2d 262, 264 (Fla. 5th DCA 1984). Story admittedly calculated damages based on "lost revenue" (Story Depo. at 95), an error that inflates Hermanns's damages estimate by several orders of magnitude.

The numbers show the severity of the error on which Story's opinion and the $2.965 million consent judgment rest. According to Story, a 90-pound box of oranges commands about $9, and the Sinkhole Road grove is 265 acres. Story assumed that each acre will produce 225 boxes, an assumption at the top end of Story's estimate that a grove infected by greening will produce between 77 and 236 boxes per acre. During McKenzie's tenure, the grove typically produced no more than 20 or 30 boxes per acre. In the 2016 season, Story estimated that McKenzie's mismanagement cost Hermanns $464,625 in "net income." (Doc. 107-21 at 2)

But citrus growing, like every other commercial agricultural pursuit, costs money, a fact of which McKenzie and Hermanns are acutely aware. On average, Florida citrus growers spend about $2,036 per acre for fertilizer, pesticides, irrigation, and other expenses every growing season. Story's "internal numbers" show growing costs of about $1,200 per acre for a young grove. (Story Depo. at 93–94) As the

grove nears maturity (about five years after planting), the cost of care-taking increases by twenty to thirty percent (according to Story).  (Story Depo. at 42)

Even if Story could grow a citrus crop for forty percent less than the typical citrus farmer in Florida, Hermanns's "net profit" between 2014 and 2021 amounts to far less than $2.965 million.[5]  Story estimated the net "loss of income" for seven seasons (Doc. 134-4 at 2), and for each season Story admittedly failed to deduct growing costs.  These are Story's estimates and the result after deducting costs:

| Season | Estimated "loss of income" (per Story) | Costs at $1,200 per acre | Net profit |
|--------|----------------------------------------|--------------------------|------------|
| 2014–15 | $167,835.74 | $318,000 | ($150,164.26) |
| 2015–16 | $359,676.50 | $318,000 | $41,676.50 |
| 2016–17 | $514,530.38 | $318,000 | $196,530.38 |
| 2017–18 | $738,775 | $318,000 | $420,775 |
| 2018–19 | $752,050 | $318,000 | $434,050 |
| 2019–20 | $594,360 | $318,000 | $276,360 |
| 2020–21 | $508,525 | $318,000 | $190,525 |
| Total | $3,635,752.62 | $2,226,000 | $1,409,752.62 |

---

[5] If growing costs equal $1,440 per acre (the low end of Story's range for a mature grove), Hermanns reaps a net profit of $964,552.62 between 2014 and 2021. If growing costs equal $1,560 per season (the high end of Story's range for a mature grove), Hermanns reaps a net profit of $741,952.62. If growing costs equal $2,036 per acre (the industry average in Florida), Hermanns loses $141,027.38. After deducting growing costs from Story's projected revenue, accountant Marty Williams concluded that Hermanns' grove "does not appear to be an economically viable option." (Doc. 120-2 at 8)

Even under a cost estimate inordinately charitable to Hermanns, the "lost profit" calculation is far too high—before accounting for the present-value defect in Story's damages calculation. Both sides agree that "future" damages must be discounted to present value to account for the interest that the money would earn if invested today and agree that Story failed to discount his damages calculation to the present value. The parties quarrel over the applicable discount rate; Travelers borrows the 12% rate used by Burris, the agricultural appraiser, while Hermanns cites a 10.5% rate. In either event, the present value of Hermanns' "lost profit" is no more than (and likely significantly less than) a million dollars.[6] After accounting for the present-value defect and the failure to subtract costs from revenue, Marty Williams, an accountant retained by Travelers, opines that the Hermanns's damages amount to less than $700,000. (Doc. 120-2 at 9)

Hermanns cites the opinion of William Todd Russell, an accountant, to support the reasonableness of the $2.965 million consent judgment. Like Story, Russell admittedly declined to include the costs of growing a citrus crop in the "lost profit" calculation. (Russell Depo. at 27 and 71) Contending that "lost profit" equals "lost revenue" minus "lost avoided costs," Russell testifies that "fixed costs" warrant exclusion from the lost-profit calculation.

---

[6] Also, Story's opinion letter claims that McKenzie's conduct diminished the value of the grove by about $1,000,000. In a deposition, Story (who lacks appraisal experience) concedes that "I did not feel that I was a, quote, 'expert'" on real-estate valuation. (Story Depo. at 92–93) In any event, provision j(5) excludes coverage for "that particular part of real property" on which McKenzie was "performing operations."

Russell's opinion misconstrues Florida law, which requires subtracting necessary costs — like the cost of fertilizing and irrigating a crop — from "lost revenue." In *RKR Motors, Inc. v. Associated Uniform Rental & Linen Supply, Inc.*, 995 So. 2d 588 (Fla. 3d DCA 2008), a trial court awarded more than $80,000 in "lost profit" based on an expert opinion that failed to account for necessary costs. The appellant's expert determined that the plaintiff's "lost profit" amounted to about $10,000 after subtracting costs. Reversing the $80,000 award, which "provided [the plaintiff] with a windfall," *RKR Motors* holds in accord with long-standing Florida precedent that a plaintiff can recover "net profit," which is the estimated revenue minus necessary and avoided costs. *Accord Indian River Colony Club, Inc. v. Schopke Const. & Eng'g, Inc.*, 592 So. 2d 1185 (Fla. 5th DCA 1992).

Legal and accounting jargon aside, all of this states the obvious. Assume that McKenzie managed the grove in accord with the oral contract, that in 2019 the grove produced 220 boxes per acre, and that each box netted $9 (the figure provided by Story). Hermanns would earn $524,700 in revenue that season.[7] But if McKenzie spent no money on fertilizer, pesticides, or irrigation, Hermanns would earn little or nothing (most or all of the crop undisputedly would wither or die from malnourishment, insects, or illness). Generously assuming growing costs of $1,200 per acre, Hermanns's profit would equal $206,700, less than half of Hermanns's

---

[7] (265 acres) multiplied by (220 boxes per acre) multiplied by $9.

claimed damages for that growing season.[8]  Under Hermanns's erroneous measure

of "profit," Hermanns's damages exceed by more than $300,000 the profit that

Hermanns would have earned if McKenzie had capably managed the grove.  The

Florida decisions consistently disapprove this anomalous result.  Neither Story's

flawed opinion nor Russell's flawed opinion alters the conclusion that the $2.965

million consent judgment unreasonably and impermissibly attempts to compensate

an imaginary and exaggerated loss.

Recognizing the inaccuracy of the "lost profit" estimate, Hermanns repairs

to arguing that the $2.965 million judgment is reasonable because Hermanns

could have requested millions more in damages.  Hermanns states that he paid

McKenzie at least a million dollars to manage the grove, money for which Hermanns

purportedly received inadequate services in return.  But the $2.965 million consent

judgment resolved only the negligence claim; Hermanns agreed to dismiss the

breach-of-contract claim in exchange for McKenzie's promise to pay Hermanns

$200,000.  The suggestion that Hermanns settled the breach-of-contract claim for too

little says nothing favorable to Hermanns's position.  On the contrary, Hermanns's

attempt to defend the reasonableness of the negligence settlement by claiming

contract damages far in excess of $200,000 suggests that the parties impermissibility

attributed to the negligence claim damages that resulted from McKenzie's alleged

---

[8] $524,700 minus ($1,200 per acre multiplied by 265 acres).

breach of contract.[9]  Waterway's testimony supports that conclusion.  Asked why the parties allocated all of the "lost profit" to the negligence claim, Waterway professed an inability to answer and stated instead that Hermanns could have demanded more money.  (Waterway Depo. at 51)

In another effort to justify the reasonableness of the $2.965 million consent judgment, Hermanns contends that the historical life-expectancy of a citrus tree in Florida is twenty years and that, therefore, he could have requested another thirteen or fourteen years of "lost profit."  But under Florida law a plaintiff may recover only damages calculable with a reasonable degree of certainty. *Sostchin v. Doll Enter., Inc.*, 847 So. 2d 1123 (Fla. 3d DCA 2003) (collecting decisions and explaining that damages cannot rely on "speculation or conjecture").  Throughout this litigation, not a single citrus expert felt comfortable projecting damages beyond the 2020–21 growing season.  Hermanns's expert, Story, "felt that reaching out beyond [2021] was irresponsible."  (Story Depo. at 104)  Story's discomfort is unsurprising; Florida's citrus yield often suffers from disease, natural disaster, and other events that reduce the yield.  In 2010, no citrus expert anticipated that greening would batter Florida's citrus industry within ten years.  And a month before the 2017 hurricane season nobody predicted that Hurricane Irma would destroy a sizeable number of

---

[9] Asked if he "raise[d] any concern" with Hermanns's counsel about the request for lost profit in both the breach-of-contract claim and the negligence claim, Waterway confusingly said: "No. I think the opposite was true. I think that I would have felt that that would be something that, you know, the economic loss defense was asserted and once the negligence count came into the case that was a vehicle for lost profits and I wasn't really concerned that lost profits were going to be a part of the theft damages and, in fact, they weren't in the numbers, so it didn't really seem to me to be an area that needed to be addressed that way." (Waterway Depo. at 51)

trees and would ruin millions of oranges in Florida.  Dependent on a pyramid of tenuous assumptions adopted by no citrus expert in this litigation, Hermanns's attempt to justify the reasonableness of the $2.965 million settlement by belatedly citing a citrus tree's historical life-expectancy seems entirely fruitless and deeply rooted in impermissible speculation.

**B. The settlement fails to distinguish between the damage from greening and the damage from McKenzie's "mismanagement."**

Between 2011 and 2015, greening devastated Florida's citrus crop — a point known to McKenzie, to Story, to Hermanns, and to every citrus grower in Florida at the time of the state-court litigation.  Alan Morris, an agricultural economist, states that "virtually all Florida citrus growers are not making nearly the profits they expected as recently as 2010, and most are incurring losses." (Doc. 115-1 at 9) McKenzie testified that greening and weather, but mostly greening, recently destroyed three-quarters of his citrus crop. (McKenzie Depo. at 66–67)  Despite knowing that greening infected the majority of Hermanns's grove and despite recognizing that greening would diminish both the citrus yield and the marketability of the remaining fruit (Story Depo. at 16–18, 46), Story never mentioned greening in the opinion letter that claimed damages of $2.965 million.  Asked why he omitted greening, Story said: "No particular reason." (Story Depo. at 69)

In his deposition, Story acknowledged the effect of greening on citrus production. (Story Depo. at 105)  Story's testimony prompted this exchange:

Q.      I believe you testified earlier that the effects of citrus greening were accounted for in your figures, is that right, in your expected yields?

A.      I do take it into account but it's . . . yes, I do take it into account but not at a specific percentage.

Q.      So did you separate out the impact of greening on fruit yields with the impact of McKenzie's management on fruit yields?

A.      No, I did not.

Q.      Why not?

A.      I didn't know — I shouldn't say I didn't know. I didn't feel that I could accurately depict that percentage . . . And this report is how can I sit here and justify a certain percentage from one thing to the other. And to what end could I even remotely back up that fact or that statement, I should say? I could not find a source that would give me that data to back myself up.

Q.      So the damages that you have calculated here, they include both the impact of the citrus greening and the impact of McKenzie's work?

A.      In my opinion, yes.

(Story Depo. at 153–55)  Similarly, Hermanns admits that greening is the "biggest factor" in the grove's diminished yield.  (Hermanns Depo. at 71)

To prevail on a negligence claim under Florida law, the plaintiff must show that the defendant's conduct more likely than not caused the plaintiff's injury. *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984).  The sole "expert" opinion on which the parties based the $2.965 million consent judgment failed to distinguish the damages attributable to greening from the damages attributable to McKenzie's misconduct, even though the parties to the litigation

understood at the time that greening had (in Story's words) "devastated" the citrus industry. Even viewing the record favorably to Hermanns, no reasonable jury could conclude that a reasonably prudent defendant would settle the negligence claim for the plaintiff's asking price, which circumvents the brutal economic fact of greening.

### C. The settlement fails to account for either the economic-loss rule or for Hermanns's failure to state a negligence claim.

The $2.965 million consent judgment is unreasonable for another reason: The consent judgment fails under the economic-loss rule. (Doc. 107-27) Citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So. 3d 399 (Fla. 2013), which ostensibly limits the economic-loss rule to products-liability actions, Hermanns responds that Waterway, McKenzie's counsel, reasonably concluded that the defense lacked merit.

The distinction between a breach of contract and a tort is the source of the duty breached by the defendant. If a contract imposes a duty and the defendant breaches that duty, the plaintiff must sue for breach of contract. If society imposes the duty, the plaintiff must sue in tort. In other words, if the allegedly breached duty is contractual, the economic-loss rule prevents suing in tort. *See, e.g.*, *Detwiler v. Bank of Central Fla.*, 736 So. 2d 757 (Fla. 5th DCA 1999) (Antoon, J.); *Woodson v. Martin*, 663 So. 2d 1327, 1331 (Fla. 2d DCA 1995) (Altenbernd, J., dissenting) (explaining that a tort "must be based upon some broader societal interest and not merely on the obligations between the parties established in their contract"); *Hotels of Key Largo, Inc. v. RHI Hotels, Inc.*, 694 So. 2d 74 (Fla. 3d DCA 1997) (Gersten, J.). A corollary to the

economic-loss rule is the rule that the plaintiff in a breach-of-contract action cannot recover damages available only in tort, for example, punitive damages.

Tiara claims to "limit the application of the economic loss rule to cases involving products liability." 110 So. 3d at 407. In a telling dissent, Justice Canady praised the economic-loss rule as a bulwark that prevents "contract law from drowning in a sea of tort." 110 So. 3d at 413. In response to Justice Canady's dissent, Justice Pariente wrote in a concurrence that the fear of contract-drowning-in-tort will not materialize because a tort claim requires a tort "independent of any breach of contract claim." 110 So. 3d at 408. Because the economic-loss rule requires a tort "independent of" the breach of contract, the concurrence has mystified the bar and the bench. (Nothing in the concurrence or the applicable precedent offers helpful guidance about distinguishing an "independent" tort from a "dependent" tort.)

The post-Tiara decisions continue to apply the economic-loss rule to bar a tort claim dependent on a contractual duty—but instead of saying "economic-loss rule," some decisions now say that the plaintiff fails to identify a tort "independent of" the breach of contract. See, e.g., Lamm v. State Street Bank and Trust, 749 F.3d 938, 947–50 (11th Cir. 2014); Kaye v. Ingenio, Filiale de Loto-Quebec, Inc., 2014 WL 2215770 (S.D. Fla. May 29, 2014) (Rosenbaum, J.).[10] Whatever the label, the principle that the

---

[10] See also Monsoon, Inc. v. Bizjet Int'l Sales & Support, Inc., 2017 WL 747555 at *8–*9 (S.D. Fla. Feb. 27, 2017) (Marra, J.); TRA Farms, Inc. v. Syngenta Seeds, Inc., 2014 WL 3844823 at *1–*3 (N.D. Fla. Apr. 4, 2014) (Walker, J.); Burns v. Winnebago Indus., Inc., 2013 WL 4437246 (M.D. Fla. Aug. 16, 2013) (Bucklew, J.); Certain Underwriters at Lloyd's of London v. Ocean Walk Resort Condo. Ass'n, Inc., (continued...)

breach of a contractual duty establishes only a breach-of-contract claim remained the governing law throughout the McKenzie-Hermanns dispute.

In this instance, Hermanns failed to state a negligence claim because Hermanns's claim against McKenzie depended on a contractual duty.[11] McKenzie's duty to care properly for the grove derived not implicitly from a source external to the contract but rather explicitly from the contract with Hermanns. In other words, although society imposes a tort duty on a doctor or a lawyer to perform non-negligently the duties for which they have contracted with a patient or client, society has not imposed on a grove care-taker the duty, for example, to plant 150 trees per acre or to spray the grove with imidacloprid. Hermanns's contract with McKenzie imposed a contractual duty to maximize profit and to care properly for the grove. Erroneously assuming the validity of the negligence claim, Waterway never moved to dismiss the claim (Waterway Depo. at 49), but the negligence claim was vulnerable to attack after *Tiara*. Likely to succeed, that attack would greatly diminish or eliminate Hermanns's prospective recovery on the negligence claim. Even viewing the record favorably to Hermanns and even acknowledging the confusion over *Tiara*, no reasonable jury could conclude that a $2.965 million

---

[10](...continued)
2017 WL 3034069 at *10 (M.D. Fla. July 18, 2017) (Dalton, J.); *Burdick v. Bank of America, N.A.*, 99 F.Supp.3d 1372, 1378–80 (S.D. Fla. 2015) (Cohn, J.); *Callaway Marine Tech., Inc. v. Tetra Tech, Inc.*, 2016 WL 7407769 (S.D. Fla. Dec. 22, 2016) (Gayles, J.); *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 2015 WL 13203447 (S.D. Fla. Aug. 27, 2015) (King, J.); *Osan v. Verizon Fla. LLC*, 2016 WL 2745001 (M.D. Fla. May 11, 2016) (Honeywell, J.).

[11] Even though McKenzie's answer omitted the defense of failure to state a claim, the defense remained available under Rule 1.140(h)(2), Florida Rules of Civil Procedure.

consent judgment over a negligence claim dependent on the breach of a contractual duty (that is, a negligence claim that fails to state a claim) is reasonable in this circumstance.

## III. Duty to defend

### A. Travelers owed no duty to defend McKenzie.

If the allegations of fact in the complaint might trigger coverage, the insurer owes a duty to defend the insured. *Marr Invest., Inc. v. Greco*, 621 So. 2d 447 (Fla. 4th DCA 1993); *State Farm Fire & Cas. Co. v. Tippett*, 864 So. 2d 31, 35–36 (Fla. 4th DCA 2003) ("The allegations . . . must state a cause of action that seeks recovery for the type of damages covered by the insurance policy."). The duty to defend depends on the facts alleged in the complaint, not the labels or conclusions in the complaint. *Cabezas ex rel. Ferrer v. Fla. Farm Bur. Cas. Ins. Co.*, 830 So. 2d 156 (Fla. 3d DCA 2002); *Trailer Bridge, Inc. v. Ill. Nat. Ins. Co.*, 657 F.3d 1135, 1145 (11th Cir. 2011) ("The theories advanced and labels used in a complaint are subordinate to the facts alleged for the purpose of determining the duty to defend.").

The bulk of the amended complaint alleges that McKenzie breached the oral contract by improperly tending to the grove and that McKenzie systematically over-billed Hermanns for goods and services. Also, Hermanns alleged that McKenzie acted "with the intent to permanently deprive" Hermanns of the grove's "monies and profits." Elsewhere in the amended complaint, Hermanns alleges that McKenzie used Hermanns's fuel "for [McKenzie's] own machines and/or

purposes." And Hermanns alleges that McKenzie planted Hermanns's trees at another grove.

Excluding prefatory allegations, the negligence claim comprises four paragraphs. Paragraph twenty alleges that Hermanns hired McKenzie to manage the grove, and paragraph twenty-one alleges that McKenzie owed a duty to "ensure that the groves were properly planted, watered, fertilized, treated, and harvested." (Doc. 107-12 at 9) Although the paragraph fails to specify the source of the duty, a "fair reading" of the complaint reveals a duty based on the parties' oral contract. Whatever the source of the duty, nothing (so far) triggers the duty to defend. Paragraph twenty-two alleges that McKenzie "deviated from the duty it owed Plaintiff, negligently performing [] services and has caused damages to [Hermanns]." Finally, paragraph twenty-three alleges that McKenzie's negligence caused damages "including but not limited [to] having to [clear] between 70 and 100 acres of land to compensate for the past improper care and consequential damages and lost profits by virtue of having an immature and underplanted grove." Excepting labels and conclusions, no factual allegation in this paragraph "potentially" suggests damage coverage by the CGL.

A "fair reading" of the allegations of fact in the amended complaint reveals damage from an intentional scheme to misappropriate Hermanns's money and property (the CGL excludes damage from an "expected or intended" injury). Although the amended complaint appears to include several allegations not dependent on McKenzie's intentional theft, the amended complaint alleges only

- 25 -

damage from McKenzie's "operations" on the grove — damage allegations excluded by the j(5) provision. In sum, the allegations in the amended complaint triggered no duty to defend McKenzie in the state-court civil action.

**IV. Both collusion and bad faith taint the settlement.**

If a settlement results from collusion or bad faith, the assignee of the insured's rights cannot recover under the insurance policy. *Sidman v. Travelers Cas. and Surety*, 841 F.3d 1197 (11th Cir. 2016) (citing *Steil v. Fla. Physicians' Ins. Reciprocal*, 448 So. 2d 589 (Fla. 2d DCA 1984)). Bad faith includes an insured's willingness to "accept a judgment of any amount so long as it would not be on the hook to satisfy the judgment." *Sidman*, 841 F.3d at 1206.

Even viewed favorably to Hermanns, the record reveals a collusive and bad-faith settlement in which McKenzie accepted the plaintiff's asking price of $2.965 million, although several available defenses likely would have diminished or eliminated McKenzie's liability for negligence. *See* Sections II(A), (B), and ©. Under the settlement, Hermanns agreed not to initiate "post-judgment financial discovery" into McKenzie's assets and agreed not to attempt collection on the $2.965 million consent judgment. (Doc. 107-19 at 6) As the Florida decisions explain, this agreement renders the settlement "suspect" from the outset. *Steil*, 448 So. 2d at 592.

More damning, the settlement includes a provision in which Hermanns agreed to recommend to the State Attorney the "most favorable" resolution in the criminal action. (Doc. 107-19 at 6) Waterway admits that securing a "favorable resolution" in the criminal action was more important to McKenzie than minimizing civil

liability: "McKenzie and his [company] have a finite amount of resources and . . . personal liberty is probably a much higher priority than anything financially at stake in a civil litigation." (Waterway Depo. at 18–19) Consequently, McKenzie devoted his "finite" resources to defending the criminal action at the expense of the state-court civil action.

Perhaps in a moment of unusual candor, McKenzie's counsel wrote in a draft of the settlement agreement that "RMS has made no independent investigation relating to the amount of alleged damage of the Groves, and relies solely on Hermann's investigation and representations when calculating the figure reached in the consent judgment." (Doc. 107-20 at 10) That provision disappeared from the final agreement after Hermanns's attorney asked to remove it. (Waterway Depo. at 61–62) Asked to describe McKenzie's "investigation" into the alleged damages, Waterway "point[ed] to Mr. McKenzie's deposition," in which McKenzie "appreciated that the Story opinion was within the realm of possibility and could be persuasive with a Central Florida jury." (Waterway Depo. at 62) Although Waterway states that he anticipated that Hermanns could have retained an economist to "turn [the numbers] into something bigger," Waterway knew at the time of the settlement that Story erroneously measured "lost revenue" instead of "lost profit" and knew that Story erroneously failed to discount his calculation to the present value.[12] (Waterway Depo. at 63) McKenzie's counsel never discussed the

_____

[12] Additionally, asked why Hermanns and McKenzie agreed to McKenzie's payment of $200,000 to resolve counts one through three, neither the principals (Hermanns and McKenzie) nor
(continued...)

Story opinion (that is, the basis for Hermanns's claimed damages) with an accountant or with a citrus expert other than McKenzie. At the time McKenzie consented to the $2.965 million judgment, McKenzie "absolutely [could] not" afford to pay the judgment. (Waterway Depo. at 79) For these reasons and for the reasons adequately explained in Travelers' motion (Doc. 108), no reasonable jury could conclude that McKenzie and Hermanns settled in good faith or without colluding.

## CONCLUSION

After Hermanns and McKenzie contracted for McKenzie to manage Hermanns's citrus groves, McKenzie allegedly stole trees, fuel, fertilizer, and other products that belonged to Hermanns and allegedly breached the contract. Hermanns and McKenzie settled the breach-of-contract claim for $200,000 but settled a so-called "negligence claim" for $2.965 million. Under the settlement agreement, McKenzie assigned to Hermanns the rights under a Travelers CGL. Even viewed favorably to Hermanns, the record reveals no genuine dispute of material fact, and Travelers is entitled to summary judgment as a matter of law because (1) the CGL excludes damage from an "expected or intended" injury, (2) the j(5) provision excludes coverage, (3) the settlement is unreasonable for at least three reasons, (4) the factual allegations in the amended state-court complaint failed to trigger the duty to defend, and (5) both collusion and bad faith taint the settlement.

---

[12](...continued)
the attorneys (Waterway, Soto, and Rodriguez) could cogently explain the apportionment. For example, Rodriguez (Hermanns's counsel) "[doesn't] think there was a particular reason" the parties allocated all of the "lost profits" to the negligence claim. (Rodriguez Depo. at 41)

Travelers' motion (Doc. 108) for summary judgment is **GRANTED**, and Hermanns's motion (Doc. 106) for summary judgment is **DENIED**. Hermanns's motion (Doc. 139) for oral argument is **DENIED**. The clerk is directed to enter judgment (1) for The Travelers Indemnity Company of Connecticut and against the defendants on counts two and three of Travelers' complaint (Doc. 9) and (2) for The Travelers Indemnity Company of Connecticut and against the defendants on counts one and two of Hermanns's counterclaim (Doc. 39). After entering judgment, the clerk must **CLOSE** the case.

ORDERED in Tampa, Florida, on June 28, 2018.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE